**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION**

| | | |
|---|---|---|
| **MITCHELL EADS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 1:18-cv-00042** |
| | ) | |
| **STATE OF TENNESSEE, et al.,** | ) | **JUDGE CAMPBELL** |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

Plaintiff Mitchell Eads, an inmate of the Turney Center Industrial Complex (TCIX) in Clifton, Tennessee, has filed a pro se complaint under 42 U.S.C. § 1983 for violation of his civil rights. (Doc. No. 1.) He has also filed an application for leave to proceed in forma pauperis (IFP). (Doc. No. 3.) The case is before the Court for a ruling on the IFP application and for an initial review pursuant to the Prison Litigation Reform Act (PLRA), 28 U.S.C. §§ 1915(e)(2) and 1915A, and 42 U.S.C. § 1997e, as well as a ruling on Plaintiff's Motion to Appoint Counsel (Doc. No. 2) and Motion for Rule 65(b) Temporary Restraining Order (Doc. No. 14).

**I.       Application to Proceed IFP**

Under the PLRA, 28 U.S.C. § 1915(a), a prisoner bringing a civil action may apply for permission to file suit without prepaying the filing fee of $350 required by 28 U.S.C. § 1914(a). Because it is apparent from Plaintiff's application that he lacks the funds to pay the entire filing fee in advance, his application to proceed IFP will be **GRANTED**. The Court's accompanying Order will assess the filing fee in installments.

## II.    Initial Review of the Complaint

### A.    PLRA Screening Standard

Pursuant to 28 U.S.C. § 1915(e)(2)(B), the Court must dismiss any IFP complaint that is facially frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.  Similarly, Section 1915A provides that the Court shall conduct an initial review of any prisoner complaint against a governmental entity, officer, or employee, and shall dismiss the complaint or any portion thereof if the defects listed in Section 1915(e)(2)(B) are identified.  Under both statutes, this initial review of whether the complaint states a claim upon which relief may be granted asks whether it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," such that it would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Applying this standard, the Court must view the complaint in the light most favorable to Plaintiff and, again, must take all well-pleaded factual allegations as true. *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)).  Furthermore, pro se pleadings must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

**B.    Section 1983 Standard**

Plaintiff seeks to vindicate alleged violations of his federal constitutional rights under 42 U.S.C. § 1983. Section 1983 creates a cause of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012). Thus, to state a Section 1983 claim, Plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution or laws of the United States, and (2) that the deprivation was caused by a person acting under color of state law. *Carl v. Muskegon Cnty.*, 763 F.3d 592, 595 (6th Cir. 2014).

**C.    Allegations and Claims of the Complaint**

**1.    Assault by Inmates, Resulting Injuries, and Treatment**

Plaintiff alleges that on January 6, 2018, while he was incarcerated at the Northeast Correctional Complex (NECX) in Mountain City, Tennessee, he was lured into another inmate's cell under the pretense that Plaintiff's cellmate, Reco Douglas, requested his presence there. (Doc. No. 1 at 6–7.) When he entered the cell, Plaintiff saw that Douglas was at the back of the cell, beaten and bloodied. (*Id.* at 7.) As Plaintiff attempted to assist Douglas, he heard the cell door close behind him, and he was then attacked from behind and struck across the face with a handheld, homemade weapon. (*Id.*) As he attempted to defend himself, he was struck again across the face by a different assailant. (*Id.*) Five inmates, all armed with weapons, were involved in the attack on Plaintiff and Douglas, and several continued to punch and kick Douglas while Plaintiff was held at bay. (*Id.*) Douglas was then forced to use a cellphone produced by one of his assailants to call his girlfriend, and to instruct her to transfer $400.00 to one of the inmates' "Greendot account" via email. (*Id.*) Douglas was given another email address in order to make another $400.00 transfer, but his girlfriend only transferred $150.00 in the second email transaction. (*Id.* at 7–8.)

3

Plaintiff was then ordered to call his fiancé, Penny Ketron, and arrange for the transfer of the remaining $250.00 demanded by his assailants. (*Id.* at 8.) Plaintiff refused, whereupon he and Douglas were escorted to their cell at knifepoint, where the assailants stole nearly all of Douglas's possessions. Plaintiff and Douglas were threatened that their assailants "worked for the Warden Randy Lee" and that if they did not receive the $250.00, "a team would be sent to our girlfriends Penny Ketron and Angela Fouts to beat[,] rape[,] torture[,] and murder them" as Plaintiff and Douglas were forced to watch on a cellphone. (*Id.*) Plaintiff was also warned that if he attempted to contact the police, his loved ones would be murdered. (*Id.*)

That night, Plaintiff was escorted to the NECX clinic for treatment of his facial injuries. (*Id.*) He was seen by a nurse, who noticed a hemorrhage in his left eye. (*Id.*) Plaintiff complained of dizziness, vertigo, difficulty balancing, extreme pain, and that his "upper teeth were floating around in 3 different directions." (*Id.*) Plaintiff was sent back to his cell briefly, and then was returned to the clinic where he complained that he could only see out of his right eye. (*Id.* at 8–9.) Yard Officer Turney (who is not named as a defendant) remarked that it looked like Plaintiff had been struck with a stick, as there was a dark, diagonal line across his left cheek. (*Id.* at 9.) Yard Sergeant Garcia took multiple cellphone pictures of Plaintiff's face and upper body, stating that he needed the pictures to show the Warden. (*Id.*) Complaining of "floating teeth and bones" in his face, constant nasal bleeding, and an inability to eat, Plaintiff was sent back to his cell with two 200-milligram tablets of ibuprofen. (*Id.*)

The following day, January 7, 2018, Plaintiff witnessed Douglas and one of the assailants get in an altercation that resulted in both inmates going "to the hole." (*Id.*) Plaintiff returned to his cell to pack Douglas's property, and was confronted there by three of the remaining assailants, one of whom "sucker punches [Plaintiff] in the face, right where [his] bones are broken." (*Id.*)

"Instantly blinded and bleeding very badly," Plaintiff made his way to the clinic where, "after a long period of begging for help and demonstrating [his] teeth moving about freely," his broken bones were again undiagnosed. (*Id.*) He was taken to "the hole/segregation" and locked up on "pending investigation status" without being allowed to bring his property with him. (*Id.* at 9–10.)

On January 8, 2018, after not having slept or eaten since January 6, and still bleeding and in unbearable pain, Plaintiff requested emergency sick call. (*Id.* at 10.) This request was denied, and Plaintiff was directed to sign up for regular sick call. (*Id.*) Around noon on January 8, Plaintiff was summoned to meet with an Internal Affairs investigator who took multiple pictures of his face, and asked if Plaintiff needed to be placed in protective custody. (*Id.*) Plaintiff advised that he was scheduled to work at his job with Shaw Industries, at the NECX Industry Woodplant TRICOR building, but was told by the investigator that he could not talk to his employer to explain his absence, and must sign a waiver or else he could "kiss this compound and your Woodplant job goodbye." (*Id.*) Plaintiff then requested to see the Warden, but the investigator left saying he would ask the Warden what was to be done with Plaintiff. (*Id.*)

On January 9, 2018, Plaintiff was taken to the clinic for sick call, having requested to see both a doctor and a dentist. (*Id.*) The doctor examined Plaintiff's teeth, and then called in the dentist, who "put gloves on and stuck his hands into [Plaintiff's] mouth and felt [his] teeth and bones moving in [his] face." (*Id.* at 11.) The dentist then looked at the doctor and said, "This man needs immediate oral maxillary surgery and you need to get him transported to Mountain City Regional Hospital right now for a CT scan." (*Id.*) Plaintiff was transported to the hospital for that scan and returned to medical segregation at NECX the same day. (*Id.*) After his return to the

prison, the doctor called him to triage and gave him two Ensure drinks[1] and two ibuprofen tablets. (*Id.*)  The doctor told Plaintiff that the CT scan revealed his need for surgery to repair "multiple fractures of the orbital lobe and oral maxillary bones."  (*Id.*)  He was taken back to his segregation unit after the doctor advised that he would be transported for surgery very soon, as the surgery "need[ed] [to] be already done."  (*Id.*)  That evening, Plaintiff's property was delivered to his segregation unit.  (*Id.*)  Only two small property bags were delivered, and Plaintiff advised a correctional officer that he was missing a lot of property.  (*Id.*)  He was told that most of his property was likely stored in the NECX property room, and he would get it when he was released. (*Id.* at 11–12.)

On January 10, 2018, at 3:00 a.m., Plaintiff was awakened and given bags to pack because he was being permanently transferred.  (*Id.* at 12.)  Plaintiff objected, advising the correctional officer that he was exempt from random and population-management transfers due to his employment as a TRICOR Shaw Industries Woodplant worker and the employment contract he signed.  (*Id.*)  Plaintiff was told to pack his belongings and go to Property/Intake.  (*Id.*)  When he arrived at the NECX property room, he was told by correctional officer Becky Wright that he had possession of all of his property, and that he needed to mark his bags "T.C.I.X." because he was being permanently transferred to Turney Center Industrial Complex.  (*Id.*)  Plaintiff alleges that he was missing a great deal of property that had been in his cell.  (*Id.* at 12–13.)

When Plaintiff arrived later that day at TCIX in Only, Tennessee, he advised the TCIX property room corporal that he was missing most of his personal property.  (*Id.* at 13.)  The corporal

---

[1]     Ensure is a supplemental nutrition drink that provides a balance of protein, carbohydrates, and fat, fortified with vitamins.  *Supplemental Nutrition Drinks: Help or Hype?*, Harvard Health Letter (July 2013), https://www.health.harvard.edu/staying-healthy/supplemental-nutrition-drinks-help-or-hype (last visited Aug. 31, 2018).

told Plaintiff to file a claim over his missing property, called the TCIX clinic, and advised Plaintiff to report straight to the clinic. (*Id.*) When he arrived at the clinic, Plaintiff was seen by Dr. Alicia Bingham, who was "horrified at the sight of [his] injuries." (*Id.*) Dr. Bingham ordered Plaintiff two Ensure drinks, Tylenol 3 for pain, and "an A.V.O. order for a liquid diet because of [his] broken face." (*Id.*) Dr. Bingham emailed the Tennessee Department of Correction Medical Director and Centurion Medical Services, requesting immediate oral maxillary surgery for Plaintiff. (*Id.* at 13–14.)

On January 18, 2018, Plaintiff was again seen in the TCIX clinic, where he complained of extreme weight loss. (*Id.* at 14.) He alleges that he had weighed 242 pounds on January 6, and twelve days later was down to 210 pounds. (*Id.*) Plaintiff requested "an A.V.O. diet of peanut butter, bananas, scrambled eggs, oatmeal and milk," and though Dr. Thomas M. Kessler ordered the diet, Plaintiff never received it. (*Id.*) Instead, Aramark Food Services personnel served him regular trays of solid foods, which he was "forced to eat . . . with a broken face or starve." (*Id.*)

On January 24, 2018, Plaintiff returned to the clinic to see Dr. Bingham, who canceled the A.V.O. per Plaintiff's request and noted that Aramark had refused to comply with it. (*Id.*) At that point, Plaintiff's weight was down to 200 pounds, and he had waited 18 days for the "immediate" oral surgery ordered by two physicians. (*Id.* at 14–15.)

On January 29, 2018, Plaintiff was transferred to DeBerry Special Needs Facility in Nashville, Tennessee. (*Id.* at 15.) The next day, he was taken to Meharry Medical College, where a 360-degree cranial x-ray was taken. (*Id.*) He was examined by a surgeon, who attempted to manipulate Plaintiff's upper teeth and facial bones, causing Plaintiff great pain. (*Id.*) Plaintiff's bones had "set up and began to heal," such that when he bit down on a tongue depressor with his front teeth, his back teeth did not touch. (*Id.*) The surgeon told Plaintiff that he wanted to wire

Plaintiff's jaw shut and try to realign his facial bones with rubber bands called "elastics." (*Id.* at 16.) Plaintiff refused this procedure, advising the surgeon that "surgery, not elastic experimentation" had been ordered for him. (*Id.*) Plaintiff alleges that when he demanded surgery, the doctor refused, and Plaintiff "refused his science project." (*Id.*) Plaintiff was transported back to T.C.I.X., where he arrived on February 2, 2018. (*Id.*)

On February 6, 2018, Plaintiff was called to see Dr. Bingham, who was not happy that Plaintiff had refused the treatment involving elastics. (*Id.*) Plaintiff advised Dr. Bingham that he had been referred for surgery, not "exper[i]mental exploratory elastic treatment," and Dr. Bingham stated that he could go back for this procedure when he was ready. (*Id.*) On February 9, 2018, Plaintiff was called to see the TCIX dentist, who noted that Plaintiff's teeth were severely out of alignment and that he could go get his procedure when he was ready. (*Id.* at 17.)

### 2. Retaliation

Plaintiff alleges that his transfer from NECX to TCIX was in retaliation for refusing to sign the waiver that the Internal Affairs officer had presented him with on January 8, 2018. (*Id.* at 10, 12, 17.) On February 16, 2018, Plaintiff's fiancé, Penny Ketron, moved from Kingsport, Tennessee to Burns, Tennessee, to be closer to Plaintiff. (*Id.* at 17.) On February 21, 2018, Plaintiff and his fiancé had their marriage counseling session and set the date for their wedding as March 18, 2018. (*Id.*) However, on March 6, 2018, Plaintiff was moved to the high security annex at TCIX, stripsearched, and detained there on a charge of conspiracy to violate state law. (*Id.*) On March 12 and 13, 2018, Plaintiff was again stripsearched and his property was searched; he alleges that these searches were retaliatory. (*Id.*) Also on March 13, Plaintiff received a memorandum from Warden Kevin Genovese stating that his wedding to Ms. Ketron would not be taking place

due to "information being discovered during an investigation." (*Id.* at 17–18.)  Plaintiff alleges that this action was retaliatory. (*Id.* at 18.)

On March 21, 2018, Plaintiff requested notary services for purposes of verifying the signature on a sworn affidavit he had prepared for his disciplinary hearing on the charge of conspiracy to violate state law. (*Id.*)  On March 23, Plaintiff was notified in writing that the notary public was not coming back to the high security annex to provide notary services until April. (*Id.*)  On March 26, 2018, without the benefit of a notarized affidavit, Plaintiff was convicted of the disciplinary infraction of conspiracy to violate state law. (*Id.*)  He received another memorandum from Warden Genovese on that day, stating that Ketron was permanently suspended from his visitation list and was permanently banned from all Tennessee Department of Correction institutions. (*Id.*)  Plaintiff alleges that this action was taken in retaliation and to cause him hardship, as Ketron has durable power of attorney for him. (*Id.* at 19.)

On April 5, 2018, Plaintiff was approached by TCIX Sergeant Gilbert, Security Threat Group Coordinator Zyla, and three members of the TCIX Green Team. (*Id.*)  He was stripsearched, handcuffed very tightly behind his back, and led barefoot down steel grated steps to be placed in a concrete shower stall that is two-and-half feet wide, where he was made to stand for over two hours while his cell was searched again, in retaliation and to discourage him from filing grievances. (*Id.*)

On April 16, 2018, when Plaintiff's punitive segregation for his disciplinary conviction ended, he was told to ready for transfer back to a non-segregated unit.  However, during the process of escorting Plaintiff away from the segregation unit, he was called back and told that he was not cleared to leave segregation. (*Id.* at 19–20.)  Based on a notation on the inmate roster board that he "does not leave [segregation] per Clendenion," Plaintiff believes that Associate Warden Jason

Clendenion had decided to retaliate against Plaintiff by keeping him in segregation. (*Id.* at 20.) Also on April 16, Plaintiff was notified by Sergeant Gilbert that he was being placed on pending protective custody, which Plaintiff believes to be retaliation. (*Id.*) His request for information related to this protective custody placement only revealed that he was being held by the Warden, though he had never been served with any notification or investigation report to that effect, leading Plaintiff to believe that Associate Warden Clendenion was behind the placement. (*Id.* at 20–21.) When his request for information revealed that the prison computer system did not have any notation of pending status for him, Plaintiff filed a grievance over the issue. (*Id.* at 21.)

On April 20, 2018, Plaintiff was taken to the office of Unit Manager David Gary, where he was advised by Gary and Special Threat Group Coordinator Clint Zyla that "this was [his] administrative protective custody hearing and that a threat was made on [his] life on the TCIX main compound." (*Id.*) It was therefore recommended that Plaintiff be placed on permanent protective custody, though Plaintiff believes he was kept in such custody as retaliation, so that his access to programs, services, and help would be restricted. (*Id.*)

### 3. Claims Asserted

Citing state law and TDOC policy prohibiting the possession of weapons in state penal institutions, and alleging that his assailants, unlike Plaintiff, were convicted of violent crimes and had "violent criminal histories" while in prison, Plaintiff asserts an Eighth Amendment failure-to-protect claim against "the Defendants." (*Id.* at 22–23.)

Plaintiff claims that, in light of the severity of his facial injuries, the failure of the Centurion-staffed medical personnel at NECX and the NECX security shift supervisor to immediately segregate him from his fellow inmates and order his hospitalization on January 6, 2018, constitutes deliberate indifference to his serious medical needs by the medical personnel,

and "a First Amendment violation of the reasonableness standard" on the part of the security shift supervisor. (*Id.* at 23.) Plaintiff further claims deliberate indifference and unreasonableness on the part of medical and security personnel, including Yard Sergeant Garcia, whose failure to segregate and hospitalize Plaintiff resulted in the second assault on him, on January 7, 2018, after which Plaintiff was again given cursory evaluation and treatment at the prison and not immediately transferred to the hospital. (*Id.* at 23–24.) Plaintiff also alleges a failure-to-protect claim based on the January 7 assault, and cites further support for his deliberate indifference claim in the non-emergent treatment of his injuries in the days that followed, including the failure to provide appropriate soft foods which resulted in Plaintiff's 40-pound weight loss. (*Id.* at 24–25, 32.) He alleges that the two attacks have left him suffering from post-traumatic stress disorder, the symptoms of which have been exacerbated by the subsequent retaliatory actions taken against him. (*Id.* at 30.)

Plaintiff claims that his January 10, 2018 permanent transfer to TCIX was retaliatory, "in violation of the Plaintiff's First Amendment rights to utilize his Shaw Industries Prisoner Industry Enhancement employment to seek retained representation to petition the government for a redress of his grievances and the Plaintiff's 14th Amendment rights to procedural due process of law and equal protection." (*Id.* at 25–26.) He claims that the loss of this job on account of the transfer resulted in financial difficulty for him and his fiancé, and caused them emotional distress for which he seeks compensatory and punitive damages. (*Id.* at 26–27.)

Plaintiff claims that the theft/loss of his personal property on January 9, 2018, violated his Fourth Amendment right to be free of unreasonable seizures, his Fourteenth Amendment rights to due process and equal protection, and his Eighth Amendment rights, as well as pertinent TDOC policies. (*Id.* at 25.)

Plaintiff claims that, from March 6, 2018 to present, he has been denied access to "legal library services, notary services, religious assembly, intimate association visitation rights with his fiancé, the fundamentally retained right to marry his fiancé, sentence reducing program job assignments, . . . vocational programs and prisoner industry enhancement jobs, college level entry course studies, [etc.]," all on account of his "unwanted/forced placement on involuntary administrative segregation and the refusal of the Defendants in violation of procedural due process to release the Plaintiff." (*Id.* at 22.) Plaintiff alleges that he "requested on May 15th 2018 to be allowed to sign a CR-3240 'Refusal of Protective Custody' form under T.D.O.C. Protective Services Policy 404.09 and Defendant David Gary responded 'It is not your choice.'" (*Id.*) Plaintiff alleges that he has no appellate process to invoke in seeking release from segregation. (*Id.*) He claims that his maintenance at this custody level was retaliatory.

Plaintiff claims that TCIX officials began a "campaign of harassment" against him after he filed grievances over the January 6th and 7th attacks, the medical treatment he received at both NECX and TCIX, and the transfer to TCIX, and after receiving multiple phone calls from his fiancé. (*Id.* at 28.) This harassment included the filing of a false disciplinary charge against him, which resulted in his placement in punitive segregation for 42 days. (*Id.*) It furthermore included his placement on administrative involuntary protective custody. (*Id.*) Specifically, Plaintiff claims that the grievance he filed on February 25, 2018, resulted in the retaliatory harassment he and his fiancé suffered, as that grievance was denied by TDOC Assistant Commissioner David Sexton on March 13, 2018, the same day that Plaintiff's fiancé was issued notice that their wedding scheduled for March 18 was canceled. (*Id.* at 29.) Plaintiff claims that these actions were taken for the purpose of preventing him and his fiancé from reporting what had occurred prior to that point, such that Defendants are guilty of tampering with a witness, victim, or informant under 18 U.S.C.

§ 1512. (*Id.* at 29–30.) He seeks the intervention of the U.S. Attorney General to prosecute these crimes. (*Id.* at 30.)

Plaintiff requests relief in the form of a declaration that his rights have been violated, as well as an order enjoining Defendants from continuing their campaign of harassment and retaliation against him. (*Id.* at 33.) He furthermore seeks nominal damages of $20,000.00 against "the Defendants jointly and severally," compensatory damages of $100,000.00 and punitive damages of $100,000.00 "against each Defendant jointly and severally," and other miscellaneous relief. (*Id.*)

### D.     Analysis

#### 1.     Failure to Protect

Under the Eighth Amendment, prison officials must "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). Although prison officials have a duty to protect prisoners from assault by other prisoners, the Supreme Court has recognized that jail and prison officials cannot be expected to prevent every assault before it occurs or to stop every assault in progress before injuries are inflicted. Thus, "a prison official may be held liable under the Eighth Amendment . . . only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. That is, the inmate must show both that the risk of harm is sufficiently "serious," an objective inquiry, and that prison officials acted with "deliberate indifference" to inmate health or safety, a subjective inquiry. *Id.* at 837–38; *Helling v. McKinney*, 509 U.S. 25, 32 (1993).

Here, Plaintiff asserts a failure-to-protect claim based on the events of January 6, 2018, when he was assaulted by a group of inmates who (1) were known to be violent offenders, whereas

Plaintiff did not have any history of violence while incarcerated, and (2) possessed homemade weapons which were prohibited under prison regulations and state law. (Doc. No. 1 at 22–23.) However, he does not allege any grounds for believing that any Defendant knew of and disregarded a risk to Plaintiff at the hands of these inmates—such as a known prior history of violence or threats of violence between Plaintiff, his cellmate, and their assailants, knowledge of facts which would make Plaintiff particularly vulnerable to such an attack, or knowledge that these inmates possessed the weapons used against Plaintiff and his cellmate. In the absence of any such allegations from which knowledge of a sufficiently serious risk to his safety could be inferred, Plaintiff fails to state a failure-to-protect claim based on the initial, January 6 assault. *Cf. Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (finding a triable issue of failure to protect based on showing that plaintiff was "young, small, apparently mentally 'slow,' and did not have experience in jail" and was attacked by cellmate who was "an older, stronger, and predatory inmate").

However, the Sixth Circuit has "recognized that a prison official may be held to be deliberately indifferent to a substantial risk to inmate safety if he is aware that an inmate is vulnerable to assault and fails to protect him." *Id.* at 767 (citing, e.g., *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004)). After receiving serious facial injuries in the January 6 attack, and after Yard Sergeant Garcia took multiple cellphone pictures of Plaintiff's face and upper body in the clinic, Plaintiff alleges that he was returned to his cell. He alleges that the next day, January 7, 2018, after his cellmate and one of the assailants were involved in another violent altercation, Plaintiff was again confronted in his cell and assaulted a second time by one of his attackers. (Doc. No. 1 at 9.) On this occasion, Yard Sergeant Garcia is properly alleged to have known that Plaintiff was particularly vulnerable to a substantial risk of serious harm because of his preexisting injuries, and to have disregarded the risk by failing to act to segregate him from his assailants. The Court

therefore finds that a colorable failure-to-protect claim has been stated against Defendant Garcia in his individual capacity.

Plaintiff also claims that the failure of the shift supervisor, Defendant "Northeast Correctional Complex Captain on shift 6 p.m. to 6 a.m./2nd shift January 6th and 7th 2018" (Doc. No. 1 at 2), to segregate him from his assailants after the January 6 attack contributed to the second assault on him. Although Plaintiff characterizes his claim against this unnamed Defendant as "a First Amendment violation of the reasonableness standard" (*id.* at 23), the Court construes it as a failure-to-protect claim. A supervisor may be liable under Section 1983 if he or she "abandon[s] the specific duties of his [or her] position . . . in the face of actual knowledge of a breakdown in the proper workings of the department." *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (quoting *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992)). This liability, however, exists only where some "execution of the supervisors' job function result[s] in [the p]laintiff's injury." *Gregory*, 444 F.3d 725, 752. In other words, the supervisor must have abdicated his or her specific job responsibility, with the "active performance of the [supervisor's] individual job function . . . directly result[ing] in the[ ] constitutional injury." *Id*. This standard is not met by Plaintiff's allegations against the supervising Captain, as he is not alleged to have actually known the extent of Plaintiff's injuries or that he was returned from the clinic to his unsegregated confinement with his attackers. Accordingly, Plaintiff fails to state a claim against this individual.

### 2. Deliberate Indifference to Serious Medical Needs

"Eighth Amendment jurisprudence clearly establishes that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain that is violative of the Constitution." *Darrah v. Krisher*, 865 F.3d 361, 367 (6th Cir. 2017) (quoting *Estelle*, 429 U.S. at 104, 105) (internal quotation marks omitted). In order to succeed in bringing

a deliberate indifference claim in the medical context, Plaintiff must allege the deprivation of a "sufficiently serious" medical need (the objective component of the claim) by a Defendant who acted with a "sufficiently culpable state of mind" (the subjective component of the claim). *Id.* at 367–68 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A prison official acts with the requisite culpability "only if he knows that [the plaintiff] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

Plaintiff's allegations, taken as true, plainly suffice to establish the seriousness of his medical need. He alleges that on the night of January 6, 2018, he presented to the NECX clinic with severe facial injuries and related symptoms which prompted: (1) Yard Officer Turney to remark that it looked like Plaintiff had been hit by a stick due to the dark, diagonal bruise across his cheek, and Yard Sergeant Garcia to take pictures to show the Warden; (2) a January 8 meeting with an Internal Affairs investigator (named earlier in the complaint as Lieutenant McCracken) who also took multiple pictures of his face and asked if Plaintiff needed to be placed in protective custody; (3) a dentist's recommendation, on January 9, that he be immediately transported to the hospital for surgery; and (4) a CT scan at the hospital on January 9, which confirmed that surgery due to multiple facial fractures "need[ed] [to] be already done." On January 8, 2018, Plaintiff requested emergency sick call because of severe pain which prevented him from sleeping or eating. These allegations satisfy the objective component of his claim.

On January 10, 2018, after Plaintiff's transfer to TCIX and examination at the TCIX clinic by Dr. Bingham, who was "horrified at the sight of [his] injuries" (Doc. No. 1 at 13), he was found to require a liquid diet and immediate surgery. Dr. Bingham prescribed more potent pain medication and allegedly emailed the TDOC Medical Director and the appropriate official at

Centurion Medical Services at that time, requesting that Plaintiff be approved for immediate surgery. However, it was not until January 30, 2018, that Plaintiff was taken to a Nashville hospital for consultation with a surgeon. By that time, Plaintiff's "bones, although displaced, ha[d] set up and began to heal," leading the surgeon to rule out surgery and state that "we will have to try something else." (Doc. No. 1 at 15–16.) These allegations establish that Plaintiff's need for earlier, surgical treatment was sufficiently serious to support the objective component of his claim.

As to the subjective component of this claim, Plaintiff's allegations are sufficient to require that the claim go forward against the triage nurses who examined and treated him on January 6, 7, and 8, 2018—the only treatment providers at NECX who are named Defendants. Construing the complaint in the light most favorable to Plaintiff, it is alleged that he was quickly dismissed from his visits with these nurses upon a cursory examination and with nothing but ibuprofen to treat his pain, despite (1) his complaints that the pain was unbearable and he was unable to sleep or chew food, and (2) the appearance that he had been struck one heavy blow with a weapon followed by another punch to the face the next day, resulting in his "top teeth [being] broken into 3 separate plates that floated independently from each other in all directions." (Doc. No. 1 at 11.) These allegations are sufficient to state a colorable claim that these nurses knew of and disregarded an excessive risk to Plaintiff's health. *See Farmer*, 511 U.S. at 847. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," *id.* at 842, and "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Terrance v. Northville Reg'l*

*Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002).  Therefore, a colorable claim is stated against these unnamed triage nurses.[2]

After his transfer to TCIX, Plaintiff alleges that notice and a request for approval of his immediate medical need for surgical treatment was provided to the TDOC Medical Director and to an appropriate official at Centurion Medical Services.  Both the Centurion Medical Services Administrator (in his individual and official capacities) and Centurion Medical Services itself are named Defendants.  "It is clear that a private entity which contracts with the state to perform a traditional state function such as providing medical services to prison inmates may be sued under § 1983 as one acting under color of state law*." Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993) (citing *West v. Atkins,* 487 U.S. 42, 54 (1988)), *abrogated on other grounds by Farmer*, 511 U.S. at 835.  Section 1983 claims against such entities are analyzed under the same rubric as claims against municipalities.  *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).

> However, entities may not be held liable under § 1983 through a *respondeat superior* theory of recovery simply on the basis that they employ tortfeasors. *Monell*, 436 U.S. at 690. Instead, a municipality or other governmental entity can be held responsible for an alleged constitutional deprivation only if there is a direct causal link between a policy or custom of the municipality (or entity) and the alleged constitutional violation. *Id.* at 694; *see also Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005) ("Like a municipality, a government contractor cannot be held liable on a *respondeat superior* theory.... [A] private contractor is liable for a policy or custom of that private contractor...."). Thus, to establish § 1983 liability on the part of an entity, a plaintiff must "identify the policy, connect the policy to [the entity] and show that the particular injury was incurred because of the

---

[2]    Plaintiff states that these Defendants will "be named after discovery."  (Doc. No. 1 at 24.) Although designation of defendants other than by their names is not favored, such designations are permissible when the defendants' identities are not known at the time the complaint is filed, but may be determined through discovery.  *See Berndt v. Tenn.*, 796 F.2d 879, 882–84 (6th Cir. 1986).  The Court concludes that it would be inappropriate to dismiss claims against these unnamed Defendants at this juncture because of the likelihood that the identities of these Defendants will be determined during discovery.

> execution of that policy." *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994) (internal quotation marks and citation omitted).

*McNutt v. Centurion Med.*, No. 2:17-CV-212, 2018 WL 735227, at *3 (E.D. Tenn. Feb. 5, 2018). However, "while '[i]dentifying the precise policy or custom may help make the complaint's allegations more plausible, . . . categorically viewing such a failure as dispositive in every case involving § 1983 claims risks imposing a higher standing of pleading than the Federal Rules of Civil Procedure mandate." *Id.* (quoting *Lott v. Swift Transp. Co.*, 694 F. Supp. 2d 923, 928 (W.D. Tenn. 2010)).

"When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates [a] constitutional infirmity." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); s*ee also Buoniconti v. City of Philadelphia*, 148 F. Supp. 3d 425, 435 (E.D. Penn. 2015) ("A significant delay in providing medical care to a prisoner in need of emergency treatment contravenes 'evolving standards of decency.'") (quoting *Farmer*, 511 U.S. at 833); *Maddle v. Corr. Med. Servs., Inc.*, No. 3:05-0306, 2008 WL 839715, at *12 (M.D. Tenn. Mar. 26, 2008) (recognizing that deliberate indifference can be shown by delay in the face of "an urgent medical need which required immediate treatment"). According to the complaint, by January 10, 2018, two physicians, one dentist, and the results of a CT scan indicated Plaintiff's need for immediate surgery, and both the TDOC Medical Director and an official at Centurion Medical Services had been notified of that need by Dr. Bingham. However, Plaintiff was not sent to consult with a surgeon until January 30, 2018, by which time he had lost 40 pounds and his facial bones had begun to heal in malalignment, rendering surgery no longer an option. The Court finds that these allegations are sufficient to go forward with a deliberate indifference claim against the TDOC Medical Director, Centurion Medical Services, and the Centurion Medical Services

Administrator in his or her individual capacity,[3] pertaining to the withholding of authorization for surgery despite knowledge of the immediacy of Plaintiff's medical need for such surgery. While Plaintiff has not specifically alleged that this withholding was pursuant to a particular Centurion policy, his allegations, liberally construed, are sufficient to demonstrate that the failure to approve emergency surgery was not based on medical reasons, and that it caused him residual injury that could otherwise have been remediated. The claims against Centurion and its administrator will therefore be permitted to proceed past this initial screening. *Cf. Corlew v. Metropolitan Sheriff's Dept.*, No. 3:15-cv-0369, 2015 WL 1756942, at *4 (M.D. Tenn. Apr. 17, 2015) (liberally construing allegation that denial of medical care was based on cost as asserting "jail-wide policy of denying necessary medical care if it is deemed too expensive").

However, Plaintiff cannot state a claim against Aramark Food Services for failure to supply soft foods (peanut butter, bananas, scrambled eggs, oatmeal, and milk) ordered by Dr. Kessler on January 18, 2018. Though Aramark is properly considered a state actor by virtue of its performance of the traditional government function of providing prison food service, *Dotson v. Shelby Cnty.*, No. 13-2766-JDT-tmp, 2014 WL 3530820, at *13 (W.D. Tenn. July 15, 2014), Plaintiff's claim against Aramark—whether construed as a claim of deliberate indifference to medical needs or as some other variety of Eighth Amendment claim—could only advance upon an allegation that "a policy or well-settled custom of the company was the 'moving force' behind the alleged deprivation of his rights." *Id.* at *14 (quoting *Braswell v. Corr. Corp. of Am.*, 419 F.

---

[3] "[I]ndividuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003). Therefore, as long as Centurion remains as a Defendant, the claim against its employee in his or her official capacity is redundant and therefore subject to dismissal. *McNutt*, 2018 WL 735227, at *3 (citing, e.g., *Malone v. Corr. Corp. of Am.*, No. 3:13-cv-1212, 2013 WL 6498067, at *7 (M.D. Tenn. Dec. 11, 2013)).

App'x 622, 627 (6th Cir. 2011)); *see Thomas v. Coble*, 55 F. App'x 748, 748–49 (6th Cir. 2003) (applying standard for municipal liability to private corporation performing traditional state function of prison operation). Unlike the claim against Centurion, Plaintiff's claim that Aramark failed to comply with his prescription for a medical diet is simply not susceptible to the liberal construction that it was motivated by an Aramark policy. Therefore, he fails to state a Section 1983 claim against Aramark.

Plaintiff also cannot state a deliberate indifference claim against the Meharry Medical College oral surgeon who recommended non-surgical treatment to realign his bite. Plaintiff does not allege that this surgeon had a contractual relationship with TDOC or Centurion Medical Services, or that he was anything other than a physician who treated hospital patients in need of the surgery he specializes in. Therefore, the oral surgeon was not a state actor, and dismissal of the Section 1983 claim against him is proper. *Scott v. Ambani*, 577 F.3d 642, 649 (6th Cir. 2009).

### 3. Retaliatory Transfer to TCIX and Loss of Property

Plaintiff claims that his January 10, 2018 transfer to TCIX was retaliatory, "in violation of the Plaintiff's First Amendment rights to utilize his Shaw Industries Prisoner Industry Enhancement employment to seek retained representation to petition the government for a redress of his grievances and the Plaintiff's 14th Amendment rights to procedural due process of law and equal protection." (*Id.* at 25–26.)

> Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Thaddeus–X*, 175 F.3d at 394. Moreover, Plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v.*

*Campbell,* 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch.*
*Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

*Lawson v. Haddon,* No. 1:09-CV-551, 2009 WL 2242692, at *8 (W.D. Mich. July 16, 2009).

In the case at bar, while Plaintiff attempts to characterize his transfer away from his job at NECX as an adverse action, he has failed to tie this transfer to any protected conduct. His attempt to name the impairment of his financial ability to hire a lawyer in the future as the predicate for his retaliation claim is a non sequitur. Moreover, at the time of his transfer, Plaintiff had not yet filed any grievances against NECX officials—the protected conduct often cited in the prison context. Nor did Plaintiff engage in constitutionally protected conduct by declining protective custody and refusing, under threat of transfer, to sign a waiver form without first speaking to the Warden. *See Bell v. Artuz,* No. 98 CIV.4710(MBM), 1999 WL 253607, at *6 (S.D.N.Y. Apr. 29, 1999) (finding inmate's refusal to waive right to single cell, under threat of transfer, was not protected conduct). Even construing the complaint liberally and in the light most favorable to Plaintiff, he has not sufficiently alleged that his transfer to TCIX was motivated by any protected conduct on his part. Plaintiff fails to state a First Amendment retaliation claim in relation to his transfer.

Nor does Plaintiff possess an interest in his Woodplant job under the Fourteenth Amendment sufficient to protect him from transfer. "[P]recedent confirms that the Constitution does not create a property or liberty interest in prison employment[.]" *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (citation and internal quotation marks omitted). Plaintiff alleges that he could not be transferred against his will "because the T.R.I.C.O.R. Prison Industries Enhancement Program job assignment I have required me to sign a contract and as such I was exempt from random transfers and population management moves." (Doc. No. 1 at 12.) Apart from the impact he presumes his employment contract to have on his transferability, Plaintiff, in order to invoke

his right to procedural due process under Section 1983, must allege "that he suffered restraint which imposed an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Allegations of termination from a prison job and transfer to a different facility do not meet this standard. *Rienholtz v. Campbell*, 64 F. Supp. 2d 721, 729 (W.D. Tenn. 1999) (citing *Mackey v. Dyke*, 111 F.3d 460, 462–63 (6th Cir. 1997)). Plaintiff fails to state a federal due process claim in the context of his transfer and job loss.

As to the alleged equal protection violation, Plaintiff cannot state such a claim without alleging class-based discrimination in his transfer. *McGaughy v. Johnson*, 63 F. App'x 177, 178 (6th Cir. 2003) (citing, e.g., *Herron v. Harrison*, 203 F.3d 410, 417 (6th Cir. 2000)); *see also Smith v. Town of Eaton, Ind.*, 910 F.2d 1469, 1472 (7th Cir. 1990) ("An equal protection claim must be based on intentional discrimination against the plaintiff because of his membership in a particular class, not merely because he was treated unfairly as an individual."). Plaintiff makes no such allegation, and thus fails to state an equal protection claim.

Plaintiff alleges that much of his personal property was lost or stolen when it was removed from his cell following his segregation at NECX, and during his subsequent transfer to TCIX, in violation of his rights under, e.g., the Fourteenth Amendment.[4] The Due Process Clause of the

---

[4]     Plaintiff also claims that his property was unreasonably seized under the Fourth Amendment, and that this loss was a cruel and unusual deprivation under the Eighth Amendment. However, a prisoner does not possess "any subjective expectation of privacy . . . in his prison cell and . . . accordingly, the Fourth Amendment proscription against unreasonable searches and seizures does not apply within the confines of the prison cell." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984); *see Tramber v. Bolton*, No. 3:12CV-P180-C, 2012 WL 2912265, at *2 (W.D. Ky. July 16, 2012). As to Plaintiff's citation of the Eighth Amendment, "[a] prisoner's claim arising from the loss of personal property is not actionable under 42 U.S.C. § 1983, even if the loss was the result of intentional conduct," unless an adequate post-deprivation remedy is denied. *Waller v. Transcor America, LLC*, No. 3:07-0171, 2007 WL 3023827, at *5 (M.D. Tenn. Oct. 11, 2007)

Fourteenth Amendment protects against the unlawful taking of a person's property by public officers. However, the Supreme Court has held that, where adequate remedies are provided by state law, the negligent or intentional loss or destruction of personal property does not state a claim cognizable under the Due Process Clause of the Fourteenth Amendment. *Parratt v. Taylor*, 451 U.S. 527, 543-44 (1981), *overruled on other grounds by Daniel v. Williams*, 474 U.S. 327 (1986); *Hudson*, 468 U.S. at 533.

Because Plaintiff's claims are premised upon allegedly unauthorized acts of a state official, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479–80 (6th Cir. 1995). Under settled Sixth Circuit law, a prisoner's failure to sustain this burden requires dismissal of his Section 1983 due process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Here, Plaintiff has not sustained his burden. State post-deprivation remedies are available to him. The Sixth Circuit Court of Appeals has held that Tennessee's statutory remedy against local governments for loss of property affords an adequate remedy to return items either negligently or intentionally converted. *Id.* at 199. Plaintiff has not alleged that he attempted post-deprivation remedies and that they were inadequate. The complaint only alleges that Plaintiff brought the missing items to the attention of officials at NECX and TCIX, and was told to file a claim. (Doc. No. 1 at 12–13). Thus, because there appear to be adequate state post-deprivation remedies available to Plaintiff, he fails to state a claim for loss of his personal property under the Fourteenth Amendment.

---

(internal citation omitted). This claim is therefore properly advanced only under the Fourteenth Amendment.

### 4. Retaliatory Segregation Beginning March 6, 2018 and its Consequences

Plaintiff claims that, beginning March 6, 2018, he was detained in the high security annex at TCIX on a charge of conspiracy to violate state law. He was convicted of the allegedly false charge on March 26, 2018,[5] and was held in punitive segregation until April 16, when he was notified that he was being placed on "pending protective custody" status. On April 20, 2018, his involuntary placement in administrative protective custody was made permanent, purportedly based on a threat made on his life on the TCIX compound. While Plaintiff was segregated from the general inmate population at TCIX, he was restricted from many of the services and programs otherwise available to inmates. Plaintiff is particularly aggrieved by the decision of the TCIX Warden, Kevin Genovese, to cancel his planned wedding to Ms. Ketron and to suspend her visitation privileges beginning March 13, 2018, first temporarily and then permanently.

Plaintiff claims that this "campaign of harassment" was in retaliation for his grievance of February 25, 2018, wherein he grieved his assault and treatment at NECX and his subsequent lack of medical treatment at TCIX. (Doc. No. 1 at 28–29; Doc. No. 1-1 at 84–86.) He makes this claim based on the fact that the grievance, having been denied at the institutional level by the grievance board and affirmed by Warden Genovese (Doc. No. 1-1 at 80–82), was denied at the departmental level by TDOC Assistant Commissioner David Sexton on March 13, 2018 (*id.* at 78), the same

---

[5]  Plaintiff alleges that his defense to the disciplinary charge was hamstrung by the unavailability of the TCIX notary public to respond to his March 21, 2018 request for her services in time for the March 26, 2018 hearing. (Doc. No. 1 at 18.) The notary, named earlier in the complaint as Ashley Weems (*id.* at 3), allegedly advised Plaintiff on March 23, 2018 that she would not be back at the High Security Annex to do notary work until April. (*Id.* at 18.) However, Plaintiff's statement that "this directly prevented me from having my day in court and defending myself"—as "a statement that is not sworn and notarized is lacking an important indication of reliability"—is entirely conclusory, and does not provide any basis for a claim against Defendant Weems. The complaint against her will be dismissed.

day that Warden Genovese informed Ms. Ketron that her wedding to Plaintiff had been canceled and her visitation privileges temporarily suspended (*id.* at 49).[6]

The filing of non-frivolous prison grievances is conduct protected by the First Amendment. *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010). Plaintiff's grievances concerning his medical treatment at NECX and TCIX are plainly not frivolous. As noted previously in this Memorandum, the second and third elements of a First Amendment retaliation claim are that an adverse action was taken against Plaintiff that would deter a person of ordinary firmness from continuing to file grievances, and that the adverse action was motivated, at least in part, by the filing of grievances. *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).

Placement in segregation and the resulting reduction in privileges are considered to be adverse actions that could deter a person of ordinary firmness from pursuing his grievances. *Hill*, 630 F.3d at 474. The suspension of Plaintiff's fiancé's visitation privileges also qualifies as an adverse action for these purposes. As to the motivation for these adverse actions, viewing the facts alleged in the light most favorable to Plaintiff, the temporal proximity of his March 6 segregation to his February 25 grievance provides at least a modicum of support for a retaliatory motive, as does the circumstantial evidence referenced in Plaintiff's complaint and the affidavit attached thereto (Doc. No. 1-1 at 60–64) concerning his transition, without explanation, directly from punitive segregation to administrative involuntary protective custody on April 16, 2018, on the order of Associate Warden Jason Clendenion. (Doc. No. 1 at 19–20.) Plaintiff alleges that he was held in protective custody without explanation for four days, until April 20, 2018, when he was taken to Unit Manager David Gary's office, where STG Coordinator Clint Zyla was also present,

---

[6]    The Court notes that Sexton was copied on Warden Genovese's correspondence with Ms. Ketron.

and advised that "this was my administrative protective custody hearing and that a threat was made on my life on the T.C.I.X. main compound" by an inmate who Zyla refused to name, so "it was recommended that I be placed on permanent protective custody[.]" (Doc. No. 1 at 21.) Such allegations, combined with the temporal proximity of his grievance filing to his adverse treatment at TCIX, are sufficiently suggestive of a retaliatory motive to state a colorable claim of retaliation at this initial screening stage. *See Hill*, 630 F.3d at 474.

Moreover, aside from being included as an adverse action for purposes of Plaintiff's retaliation claim, the alleged cancellation of his planned wedding to Ms. Ketron and permanent suspension of their visitation privileges is properly characterized in the complaint as the denial of a fundamental right (Doc. No. 1 at 18), and is liberally construed as stating a due process claim:

> It is undisputed that the right to marry is protected by the Due Process Clause of the Fourteenth Amendment. *Zablocki v. Redhail,* 434 U.S. 374, 383, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). "The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (quoting *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)). It is also undisputed that the right to marry extends to prisoners. *Turner v. Safley,* 482 U.S. 78, 95, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). However, the right is not unfettered. *Turner* holds that a prisoner's right to marry may be restricted where the restriction is reasonably related to a legitimate penological interest. *Id.* at 96–97, 107 S.Ct. 2254. Applying that test, the *Turner* Court held unconstitutional a Missouri regulation that prohibited prisoners from marrying unless the superintendent found compelling reasons for allowing the marriage. *Id.* at 97–98, 107 S.Ct. 2254. The Court noted that "legitimate security concerns" may require placing restrictions on an inmate's right to marry, *id.* at 97, 107 S.Ct. 2254, and that the right "is subject to substantial restrictions as a result of incarceration," *id.* at 95, 107 S.Ct. 2254. Therefore, *Turner* recognizes a prisoner's right to marry, but also recognizes that the right can be curtailed for penological reasons.

*Toms v. Taft*, 338 F.3d 519, 524–25 (6th Cir. 2003). The second letter from Warden Genovese to Ms. Ketron, written on March 26, 2018 and attached to Plaintiff's complaint, states as follows: "I am sending this letter to inform you that upon completion of an investigation by OIC, I am permanently suspending your visitation privileges with inmate Mitchell Eades #243729 from any

special visit or permanent visitation placement on any inmate visitation list within the TDOC system due to the risk to the institution's security." (Doc. No. 1-1 at 18.) Particularly as the visitation ban is purported to be permanent and to apply in any TDOC institution, the legitimacy and sufficiency of the cited security concerns must be tested by the adversarial process. This claim will be allowed to proceed past initial screening.

However, Plaintiff is not entitled to any relief claimed under 18 U.S.C. § 1512, a statute criminalizing witness tampering. As this criminal statute does not provide a private right of action, Plaintiff's reference to it in his civil rights complaint, and his request that the U.S. Attorney General be directed to intervene under 42 U.S.C. § 1997c (which only allows permissive intervention on motion of the Attorney General), is frivolous. *Roberts v. Choate Const. Co.*, No. 5:11-CV-120-OC-32TBS, 2011 WL 5006469, at *2–3 & n.8 (M.D. Fla. Oct. 20, 2011); *Drake v Enyart*, No. 3:06CV-217-S, 2006 WL 3524109, at *5 (W.D. Ky. Dec. 4, 2006).

### 5.      Proper Defendants

Plaintiff's complaint names thirty-one Defendants. (Doc. No. 1 at 1–4.) The State of Tennessee, TDOC, NECX, and TCIX are all named in the caption of the complaint. All claims against NECX and TCIX are subject to dismissal, as are the damages claims against the state and TDOC.

NECX and TCIX, two state prisons within the Tennessee Department of Correction, are not subject to suit under Section 1983. *Anderson v. Morgan Cnty. Corr. Complex*, No. 15-6344, 2016 WL 9402910, at *1 (6th Cir. Sep. 21, 2016). "To state a § 1983 claim, a plaintiff must allege that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or federal law. A state prison is not a "person" subject to suit under § 1983." *Id.*

(citing *Flagg Bros. v. Brooks*, 436 U.S. 149, 155–57 (1978), and *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65–71 (1989)). Claims against these Defendants are thus properly dismissed.

The Eleventh Amendment to the United States Constitution "bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments, by citizens of another state, foreigners or its own citizens." *Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1991). This sovereign immunity acts as a bar to "[Section] 1983 suits against a state, its agencies, and its officials sued in their official capacities for damages." *Cady v. Arenac Cnty.*, 574 F.3d 334, 342 (6th Cir. 2009) (citing *Kentucky v. Graham*, 473 U.S. 159, 169 (1985)). Moreover, neither a state nor its officials acting in their official capacity are "persons" for purposes of a Section 1983 damages claim. *Will*, 491 U.S. at 71. Plaintiff's claims against the state of Tennessee and TDOC (a department of the state) are therefore barred by the Eleventh Amendment and do not fall within the purview of Section 1983. Likewise, Plaintiff's official capacity claims for damages against the host of state prison officials named in his complaint are properly dismissed.

The following individual Defendants are named as such in the complaint and sued in their individual and official capacities, but no specific conduct is attributed to them in the factual allegations supporting Plaintiff's claims: NECX Associate Wardens Todd Wiggins and Kevin Hampton; NECX Chief Counselor Angel Dixon; NECX Jobs Coordinator Linda Keller[7]; Correctional Officer (C/O) Fuentes; the NECX Medical Director; NECX Property Room Corporal

---

[7] The complaint's allegations only mention "the IJC 'inmate jobs coordinator'" in referring to TDOC policy, which states that the IJC "shall notify inmates and supervisors, in writing, of all terminations." (Doc. No. 1 at 26.) While Plaintiff asserts the fact that he never received such notification as a violation of his rights under TDOC policy and support for his theory that his transfer was retaliatory (*id.*), he does not allege that Defendant Keller participated in the retaliatory transfer for purposes of terminating his job assignment.

Cox; TDOC Assistant Medical Director Brenda Boyd; TCIX Health Services Administrator Kevin M. Rhea; TCIX Classification Coordinator Megan Taylor; and, TCIX Legal Library CCO Newsome. It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (noting requirement that allegations of complaint "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests"). Where a person is named as a defendant without an allegation of specific conduct attributed to him, the complaint against him is subject to dismissal, even under the liberal construction afforded to pro se complaints. *See Gilmore v. Corr. Corp. of Am.*, 92 F. App'x 188, 190 (6th Cir. 2004) (dismissing complaint where plaintiff failed to allege how any named defendant was involved in the violation of his rights); *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing plaintiff's claims where the complaint did not allege with any degree of specificity which of the named defendants were personally involved in, or responsible for, each alleged violation of rights). The claims against the above named Defendants will therefore be dismissed.

While NECX Warden Randy Lee is presumed to be "the Warden" for whom pictures of Plaintiff's injuries were taken (Doc. No. 1 at 9), and who made the decision to transfer Plaintiff (*id*. at 10), the complaint does not sufficiently allege his personal involvement in any failure to protect or deliberate indifference, nor any entitlement to relief based on the transfer to TCIX. Similarly, these claims are not viably asserted based on the allegations against NECX Internal Affairs Lieutenant McCracken, who allegedly took pictures of Plaintiff's face for purposes of his investigation and sought Plaintiff's signature on a waiver form after he declined protective custody. Lastly, the complaint fails to state a claim against the TCIX notary public, Defendant

Ashley Weems, as discussed above, *supra* at n.5. Accordingly, the complaint against each of the above named Defendants will be dismissed.

Otherwise, this action will go forward as described above, against Centurion Medical Services and its "Administrator responsible for overseeing medical operations/medical services" at TDOC facilities; NECX Yard Sergeant Garcia; NECX "Triage Nurses who treated Plaintiff at 11:15 p.m. January 6th 2018, 12 [a.m.] January 7th 2018 and 7:30 p.m. January 7th 2018"; the TDOC Medical Director; TCIX Warden Kevin Genovese; TCIX Assistant Warden Jason Clendenion; TCIX Unit Manager David Gary; and, TCIX Security Threat Group Coordinator Clint Zyla.

### 6.    Motion to Appoint Counsel

An indigent plaintiff in a civil action, unlike a criminal defendant, has no constitutional right to the appointment of counsel. *Lanier v. Bryant*, 332 F.3d 999, 1006 (6th Cir. 2003); *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993). Rather, the appointment of counsel is a "privilege justified only by exceptional circumstances." *Lavado*, 992 F.2d at 606 (citations omitted). Whether to appoint counsel for an indigent plaintiff in a civil action is a matter within the discretion of the district court. *Id.* at 604. In making the determination of whether the circumstances warrant the appointment of counsel, courts are to consider the type of case presented and the abilities of the plaintiff to represent himself. *Id.* at 606 (citations omitted). Evaluation of these factors in turn "generally involves a determination of the complexity of the factual and legal issues involved." *Id.* (internal quotation marks and citation omitted).

It does not appear from the record at this time that this case presents any significant complexities requiring the assistance of an attorney to develop or present. Accordingly, Plaintiff's

motion to appoint counsel (Doc. No. 2) is **DENIED** without prejudice to Plaintiff's ability to seek such appointment if developments in the case make clear that it is warranted.

## III.     Plaintiff's Motion for Rule 65(b) Temporary Restraining Order

Plaintiff has filed a Motion for Rule 65(b) Temporary Restraining Order (TRO) (Doc. No. 14), which begins with a restatement of all the ways in which he claims Defendants have retaliated against him, as alleged in his complaint. (*Id.* at 1–2.) He then alleges that, since the filing of his complaint, his "mail has been delayed and maliciously lost/destroyed," including an instance of receiving a letter from his sister nine days after it was received at TCIX; he has also received mail that was intended for another inmate. (*Id.* at 2–3.) Plaintiff next alleges that he was threatened with Indefinite Maximum Security placement for having filed grievances and lawsuits. (*Id.* at 3.) He has also been accused of involvement in a plot to burn down a correctional officer's home, creating a "very real and grave danger" to him at the hands of other TCIX staff members. (*Id.*) He complains that his attempt to send mail to the NECX Defendants was rebuffed with the explanation that it was not legal mail, and therefore could not be mailed without sufficient postage. (*Id.* at 4.) Plaintiff complains that he has also been denied materials necessary to compose legal documents, such as "a jailhouse lawyers handbook, [] a prisoners self help litigation manual, [] addressed envelope request forms, [] and plain paper, pens and envelopes[.]" (*Id.* at 5.)

Plaintiff summarizes the grounds for his motion as follows:

> The injury I am being dealt is the fundamental right to marry my fiancé and visit with her, the fundamental right to seek legal redress for being attacked and nearly murdered, kidnapped and held hostage by armed gangmembers, the fundamental right to access to the courts and the fundamental right to freedom of association through the mail. The irreparable injury that is likely to occur if this Temporary Restraining Order is not granted or issued is an irreparable loss that will be difficult to calculate. Restated, the movant could certainly lose his case due to the Defendants denying him either legal library or mail services and thus the Movant/Plaintiff alleges that the potential loss of damages requested in his complain constitute[s] irreparable injury. Alternatively, the loss of an opportunity

to timely respond to an incoming letter could potentially lead to the loss of any number of things beyond compensation by money such as an opportunity to timely respond to a dying loved one. Note for the record please that the Movant's fiancé is battling cancer please.

(*Id.* at 6–7.) He seeks the entry of an order enjoining and restraining Defendants from (1) denying him the fundamental right to marry his fiancé; (2) denying him access to "legal library materials"; (3) denying him the fundamental right to send and receive mail; and (4) retaliating against him "in any manner whatsoever." (*Id.* at 7–8.) The Court considers this request under the standards that follow:

Federal Rule of Civil Procedure 65 governs the Court's power to grant injunctive relief, including temporary restraining orders without notice. Fed. R. Civ. P. 65(b). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). However, "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978) (internal citations omitted). "Temporary restraining orders and preliminary injunctions are extraordinary remedies which should be granted only if the movant carries his burden of proving that the circumstances clearly demand it." *Ciavone v. McKee*, No. 1:08-cv-771, 2009 WL 2096281, at *1 (W.D. Mich. July 10, 2009) (citing *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)). Further, where "a preliminary injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive action ... the requested relief should be denied unless the facts and law clearly favor the moving party." *Glauser-Nagy v. Med. Mut. of Ohio*, 987 F. Supp. 1002, 1011 (N.D. Ohio 1997).

In determining whether to issue a temporary restraining order or preliminary injunction under Federal Rule of Civil Procedure 65, a district court must consider the following four factors: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *See, e.g., Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007); *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006) (noting that the same four factors apply regardless of whether the injunctive relief sought is a TRO or a preliminary injunction). "These factors are not prerequisites, but are factors that are

to be balanced against each other." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (internal quotations omitted).

*McNutt*, 2018 WL 735227, at *5.

In the case at bar, considering the standards cited above and applying the four-factor test, the Court finds that the requested temporary restraining order should not issue at this time. At this point, Plaintiff's likelihood of success on the merits of his due process right to marriage claim or his First Amendment retaliation claim is roughly equivalent to Defendants' likelihood of success on these claims—the resolution of both claims will come down to the strength of Defendants' justifications for the actions taken against Plaintiff. Concerning the irreparable harm which Plaintiff might suffer in the absence of a TRO, it does not appear that any such harm is imminent with respect to the issues he is experiencing with prison mail and the materials required to draft legal documents; for instance, he was able to draft the recent TRO motion and the Court received this legal mail in a timely fashion. With respect to redress for his assault by fellow inmates, the denial of his right to marry his fiancé, and Defendants' ongoing retaliatory conduct, these issues will be litigated. "The purpose of a [TRO] or preliminary injunction is to maintain the relative positions of the parties until proceedings on the merits can be conducted." *McNutt*, 2018 WL 735227, at *6 (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Those proceedings are now underway. Plaintiff's concerns that he is in grave danger from TCIX staff because of the accusation that he plotted to burn down a correctional officer's house, or that he could lose this case in the absence of legal materials and supplies, are simply too speculative to warrant emergency injunctive relief. His concern that mail interruptions could cause him to miss the opportunity to timely respond to a dying loved one is also speculative, even considering his notation for the record that his fiancé is battling some form of cancer. It thus does not appear that the factors affecting Plaintiff justify the issuance of a TRO at this time.

Moreover, in considering the harm that issuance of a TRO would have on others, the Court must tread carefully in recognition that the state prison setting is unique, and any relief that "would remove from prison officials the deference that they are generally afforded in the administration and control of the prison" would necessarily be disruptive and harmful. *Id.* (citing, e.g., *Griffin v. Berghuis*, 563 F. App'x 411, 417–18 (6th Cir. 2014), and *Glover v. Johnson*, 855 F.2d 277, 284 (6th Cir. 1988)). Finally, the Court does not find that the public interest would be particularly impacted by the issuance or non-issuance of the requested TRO.

On balance, the above factors weigh against the issuance of the requested TRO. Accordingly, the Court will **DENY** the Motion for Rule 65(b) Temporary Restraining Order (Doc. No. 14) without prejudice to renewal if warranted by a change in Plaintiff's circumstances.

## IV.     Conclusion

In summary, the Court finds that the complaint states colorable Eighth Amendment claims of failure to protect against Defendant Garcia, and deliberate indifference to serious medical needs, against the NECX "Triage Nurses who treated Plaintiff at 11:15 p.m. January 6th 2018, 12 [a.m.] January 7th 2018 and 7:30 p.m. January 7th 2018," the TDOC Medical Director, and Centurion Medical Services and its Administrator in his individual capacity. The Court finds that the complaint also states a colorable First Amendment retaliation claim against TCIX Warden Kevin Genovese, TCIX Assistant Warden Jason Clendenion, TCIX Unit Manager David Gary, and TCIX Security Threat Group Coordinator Clint Zyla. Finally, the Court finds that the complaint states a colorable Fourteenth Amendment claim again TCIX Warden Kevin Genovese, for denial of Plaintiff's right to marry. These claims survive the required PLRA screening and shall proceed for further development. The remaining claims of the complaint shall be dismissed pursuant to 28

U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1), for failure to state a claim upon which relief can be granted.

      An appropriate Order will enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE